## MARSHALL and others *v.* BIGLER and others.

*(District Court, S. D. New York.* October 28, 1880.)

1. CHARTER-PARTY—NEW AGREEMENT—CARGO—FREIGHT.

In Admiralty.

*Butler, Stillman & Hubbard,* for libellants.

*Enoch L. Fancher,* for defendants.

CHOATE, D. J. This is a libel *in personam* to recover the balance of freight alleged to be due under a charter-party. The charter-party was for the carriage of a full cargo of hewn white-oak timber and plank from Newburgh, on the Hudson, to Mare's island navy yard, California, at the rate of 45 cents per cubic foot, "freight measure," cash, on proper delivery of the cargo at Mare's island, "on presentation of the receipt here of the delivery." The libel alleges that the cargo consisted of 47,372 feet of timber and 12,742 feet of plank, or a total of 60,114 feet; that the same was duly delivered and the receipt for the same presented as required by the charter-party; that the amount of the freight was $27,051.30, on which there had been paid $25,724.74, leaving due a balance of $1,326.56, for which this suit was brought.

The answer alleges that the cargo consisted of 45,137 3-12 feet of timber, and 12,028 10-12 feet of plank, or a total of 57,166 feet, on which the freight amounted to $25,724.74, which had been fully paid. The answer also denies that the libellants had presented any receipt for the delivery of the cargo, which is claimed to be made, by the charter-party, a condition of the payment of the freight. The answer further set up as a separate defence the making of a new agreement between the parties subsequent to the charter-party, whereby the sum of $25,724.74 was agreed upon in full compensation

for the freight upon this cargo, to be paid in notes, under the terms of which new agreement there was due from the libellants to the defendants the sum of $461.42 as a rebate of interest.

1. The first question to be determined is the amount of the cargo. The libellants, in proof of their allegation that the cargo consisted of 47,372 feet of timber, and 12,742 feet of plank, have produced the testimony of a United States inspector of lumber, and his assistant, examined under commission in California, in January, 1875, to the effect that they measured the cargo of the vessel on its delivery at Mare's island navy yard, and that they took both the government measurement and the freight measurement; that the freight measurement was 60,114 cubic feet, and the government measurement was 57,290 cubic feet. It further appeared, by the correspondence between the parties in the year 1874, that the libellants had claimed that these amounts were distributed between the timber and plank as follows:

|  |  |  |  |  |  | Feet. |
|---|---|---|---|---|---|---|
| Government measure of timber, | | | - | - | - | 44,915 |
| "      "      " plank, | | - | - | - | - | 12,375 |
|  |  |  |  |  |  | 57,290 |
| Freight, | " | " timber, | - | - | - | 47,372 |
| " | " | " plank, | - | - | - | 12,742 |
|  |  |  |  |  |  | 60,114 |

But the libellants offered no evidence of the respective measurements of the timber and the plank, as found by these witnesses. The California inspector testified that there was a difference between government measurement and freight measurement; that the government measurement includes only sound timber, and excludes all raft plugs and other defects, while freight measurement is the actual cubic measurement, including everything—raft plugs and all other defects. Against the evidence of the California inspector and his assistant the defendant has produced the testimony of the government inspector who measured the lumber for the government at

the time of its shipment at Newburgh. He was examined in court in October, 1880, and was aided in giving his testimony by the book in which he entered the measurement of the lumber. His testimony is to the effect that he measured each stick of timber and ascertained its actual cubic contents; that his measurement was taken from the extreme end of each stick to the other extreme end; that the timber was square-hewn timber; that there were no spurs on the timber or other defects making it necessary to reject any part of its length in the return of the government measurement; that the logs afterwards sawn into plank were first measured in the stick; that afterwards the planks were separately measured; that the total measurement of the logs, including those sawn into planks, was 60,695 11-12 cubic feet; that those sawn into planks measured 15,618 8-12 cubic feet; that these made, in planks, 12,028 8-12 cubic feet; that what went into the vessel was the unsawn timber, 45,137 3-12 cubic feet, and plank 12,028 8-12, making a total of 57,165 11-12 that went into the vessel; that he gave Bigler & Co., the defendants, a certificate for the 60,695 11-12, on which they were to get their pay from the government.

There is testimony on the part of the libellants tending strongly to show that this witness did not measure the logs from one end to the other, but that he rejected in his measurement defective parts at both ends; that there were spurs on the large ends of the sticks and other defects, and that in measuring the logs he only measured the square, sound portions. There is evidence on the other hand corroborative of his statement that his measurement was of the actual and entire cubic contents of the logs. The book produced by the witness contains a tabulated statement of the logs by number from 1 to 1,010, giving the length in feet, the breadth and depth in inches, and the contents of each in cubic feet. Of the 1,010 logs in number so entered in the book 15 are not now filled out, the figures indicating the dimensions and contents have been erased, and nothing is carried into the footings of the columns for their contents. It is the testimony of the inspector that the logs sawn into plank are in this

table marked "P," and 302 of the 995 logs whose contents are given in the table are so marked. The bill of lading calls for 693 pieces of timber, and there are 693 pieces of lumber, besides those marked "P," whose contents are given in this table. This table covers 47 pages, each of which is separately footed up. After the table comes the following entry on a separate page:

RECAPITULATION.

| | | | | |
|---|---|---|---|---|
| 997 pieces, containing | - | - | - | 63,507 10-12 |
| Less thin boards and heart plank, etc., left | | | | |
| on dock, - | - | - | - | -   2,811 11-12 |
| | | | | |
| 997 pieces, - | - | - | - | 60,695 11-12 |

The witness testified that the 2,811 11-12 cubic feet of thin pieces, etc., was ascertained by him from the actual measurement of pieces that came off of the sawn logs, which pieces were not suitable for planks.

An examination of the detailed statement or table contained in the book gives the following result:

| | | | |
|---|---|---|---|
| The 693 logs not marked "P" contained | - | | 45,160 7-12 |
| The 302 logs marked "P" contained | - | - | 18,346 6-12 |
| | | | |
| Total, | - - | - - - | 63,507 1-12 |

This result differs from the total given in the "recapitulation" only by nine-twelfths of a cubic foot—a difference, doubtless, owing to a mistake in the "recapitulation" in adding up the footings of the pages. It is evident from this statement, as well as from the witness' own testimony, that his memory was somewhat at fault in respect to the matter. The total contents of the 302 logs sawn into planks was 18,346 6-12, instead of 15,618 8-12, as stated by him. The amount entered on defendants' books as the amount of the 693 unsawn logs, which amount the defendants also furnished to the libellants afterwards as the amount of freight measurement on which to compute the freight, was 45,137 3-12 instead of 45,160 7-12, which is the true result of the inspector's book. I have not been able to discover how this slight difference occurred. The defendants appear to have taken the figures

from the inspector or his account, and the difference may be accounted for on the supposition of an error in adding up the total of the contents, given in his book, of the 693 logs not marked "P."

It is evident that the amount of the logs sawn into plank, for which the inspector gave the defendants a certificate to use with the government, was diminished by the 2,811 11-12 feet of boards, etc., left on the dock. But deducting this from the total of 302 logs by the book, 18,346 6-12, we have 15,534 7-12. This differs also a little from the witness' statement of the contents of the logs sawn into planks, 15,618 8-12. This difference remains unexplained. His testimony is that 303 logs were so sawn. Those marked "P" are only 302. At the other end of the book is a table apparently showing the contents of the planks, the table giving the contents of 632 planks. Against each there is noted the number of the log, corresponding with the numbers of those entered with the mark "P" in the book, except that four of the logs which are left blank in the book appear in this table of the planks. The total contents of the 632 planks is 146,-169 feet board measure. This is equivalent to 12,180 9-12 cubic feet. The four logs included in this table which are not included in the 302 logs marked "P"—Nos. 579, 701, 906, and 907—furnish 7 planks, whose contents in all are 1,452 feet board measure, or 121 cubic feet. Deducting these we should have 625 planks, containing 12,059 9-12 cubic feet. The testimony of the inspector was that the planks measured 12,028 10-12 cubic feet. The bill of lading calls for 626 planks. It contains a memorandum also that five planks are in dispute, to be delivered if on board.

It is thus impossible to reconcile with the book kept by the inspector his testimony as to the quantity either of the timber or of the planks that went on board. The quantities given by him, and now insisted on by the defendants as the true measure, differ from those shown by his book; and the method by which one was derived from the other—by addition, subtraction, or alteration of figures—cannot now, apparently, be discovered. The total quantity of timber and

planks sworn to by him as his measurement—57,166 cubic feet—does not differ materially from the quantity found by the California inspector as the result of his government measurement—57,290 feet. Considering the uncertainties above pointed out, in regard to the Newburgh inspector's testimony, I think the California inspector's return of the government measurement is the more trustworthy, unless his whole testimony is to be rejected, as is insisted by the counsel for the defendants. It is insisted that there is evidence of an intention on the part of the captain of the vessel to procure at Mare's island a greater and false return of the freight measurement. There is nothing in the testimony, of any value as evidence, supporting this theory; and the point made, that because the mate of the vessel testified that he helped the California inspectors by holding the tape-line, therefore discredit is thrown on the results they reached, has, I think, no force.

The principal question, however, is whether these California inspectors are to be credited in their statement that the actual or freight measurement of the timber and planks was 60,114 cubic feet. If this is true the Newburgh inspector who was examined on the trial was mistaken in his recollection that he took the actual measurement of the entire logs. He must have taken less than that to account for the large difference in quantity. It is not improbable that, when examined six years after the event, his recollection should be at fault on this point. His measurement was undoubtedly a measurement for the government alone, and not for the purpose of getting the freight measurement. Upon all the testimony I think it is clearly proved that there was a difference between the government and the freight measurement of this cargo, and that the measurement taken by the inspector here was government and not freight measurement, and that the amount given by the California inspector must be taken to be the only freight measure that was taken. The allegations of the libel as to the quantity of the cargo and amount of freight, according to the charter-party, are satisfactorily proved.

2. The defendants clearly waived the condition of the charter-party requiring a formal receipt of the delivery of the cargo. On the fourth of April, 1874, the libellants, having received advices of the delivery of the cargo and of the quantity delivered, as stated in the libel, wrote to the defendants giving in detail such return, and calling on defendants to settle the balance of the freight. The defendants replied to the letter on the eighteenth of April. This reply and the subsequent correspondence show that the defendants accepted this statement in the libellants' letter of April 4th in lieu of the promised receipt, without any objection to the form in which the amount was communicated. It is now too late to insist on a technical compliance with this provision of the charter-party.

3. The defence set up in the answer, of a new and subsequent agreement discharging the charter-party, grows out of a transaction that took place between Mr. Bigler, one of the defendants, and Mr. Lamson, one of the libellants, who has died since this suit was commenced. After the ship was loaded, and perhaps after she had sailed, Mr. Bigler came to New York and had an interview with Mr. Lamson at his office here. There had been some previous conversation between them regarding the giving of notes for the freight, and Mr. Bigler brought with him an unsigned bill of lading and the paper which is claimed to be the new agreement, drawn at Newburgh, except that the details of the notes were not inserted. It is a receipt for four notes, amounting in all to $25,774.74, payable in three, four, five, and six months from their dates, August 14, 1873. The receipt states that "said notes are given to and received by us (C. H. Marshall & Co.) for our compensation for charter of ship Alexander Marshall, owned by us and chartered to said J. Bigler & Co., to convey a cargo of timber and plank from Newburgh to Mare's island, and when paid are to be in full for said compensation."

Then follows an agreement to pay J. Bigler & Co. interest at 7 per cent. per annum on all moneys they shall pay on said notes, or either of them, from the dates of such payments to the time of the delivery to the said J. Bigler & Co., in New York city, of a receipted bill of lading, showing due delivery of said

cargo, etc., or until the moneys so paid by them shall be refunded by C. H. Marshall & Co., or the notes delivered up to them. And then follows an agreement as to giving up the notes or refunding the money in case of wreck or other event defeating the delivery. The amount of the notes was computed at the rate named in the charter-party, 45 cents per cubic foot upon 57,166 cubic feet. These figures were furnished to Mr. Lamson by Mr. Bigler as the quantity of lumber shipped, namely: timber 45,137 3-12, and plank 12,028 10-12; and these amounts were minuted in pencil on the unsigned bill of lading produced at the same interview by Mr. Bigler. It is testified by Mr. Bigler that Mr. Lamson demanded that Bigler & Co. should pay freight on a larger amount, which Mr. Bigler stated to him was the quantity on which the government paid him, that amount including the cubic contents of the logs sawn into plank, instead of the 12,028 cubic feet, the quantity of the plank. But I am not able to credit the testimony of Mr. Bigler on this point. It is grossly improbable. The other party to the conversation is dead. The captain, who Mr. Bigler swore was present, denies that he was there. The witness Bigler is not only an interested party, but is to such a degree what may properly be called a swift witness, that his statements are to be received with great caution on any point on which he may be mistaken. Mr. Bigler having furnished the figures, the notes were filled out and signed; the blanks in the receipt were filled, and it was signed. The bill of lading was also signed by Lamson in the name of C. H. Marshall & Co., and delivered, with the receipt, to Mr. Bigler. This bill of lading provides that the freight is to be paid "as per charter-party." At the same time, Mr. Bigler signed an agreement to pay any unpaid notes not yet matured upon presentation of the receipt for the delivery of the cargo.

I think it sufficiently appears from this paper, called an agreement, and from that signed by Mr. Bigler, and the bill of lading signed and delivered at the same time, that this paper or receipt signed by the libellants was not, within the intention of the parties, a new and substituted contract as to the amount of freight, but that the transaction represented

by it was merely a payment in advance, by means of notes, of the freight stipulated for in the charter-party, and that the words "in full compensation," used in the instrument, have no greater effect than such words in a receipt for money due under a contract; that there was no purpose to depart, as to the amount of freight, from the terms of the charter-party, but on the contrary to adhere to those terms and settle on the basis of them; that it was an agreement, not as to the terms of the contract for the use of the ship, but only as to the mode of paying the amount due or to become due under the contract for the use of the ship, which, in all other respects, including the rate of freight, was adopted and continued in force by the express reference thereto in the bill of lading, which is to be regarded as part of the same transaction. The adjustment of interest to conform to the payments to be made to the actual payment required by the charter-party, and to make them exactly equivalent to it, strongly shows the same purpose.

The fact that Mr. Bigler furnished the amount of the cargo as the actual or freight measurement, which is proved by Mr. Bigler's own admission, and the fact that the libellants accepted it upon his statement, clearly show that both parties acted under the assumption that this amount was what the charter-party called for, and that they both intended, so far as the amount of freight was concerned, to adhere to the charter-party, and understood that they were doing so. The defendants insist still that this amount was the actual freight measurement. The fact being proved that it was some 3,000 cubic feet short of that, they cannot now insist that they shall have the benefit of the mistake which the libellants were led into by the defendants' own statement of the fact, erroneously, but perhaps innocently, made. If the receipt given had the character of a substantially new agreement imputed to it by the defendants, so that it could not at law be varied by parol, the case is clearly one in which the libellants are entitled to be relieved from it on the ground of mistake. If, on the one hand, Mr. Bigler's misstatement of the amount was intentional, then the libellants are entitled to be relieved on the

ground of fraud. If it was an innocent mistake, then it is unjust and unconscionable for him to insist on the benefit of it. Moreover, the correspondence between the parties shows clearly that the defendants admitted the libellants' right to a re-adjustment of the amount of the freight if their claim was sustained that the freight measurement in fact exceeded that which was made the basis of the alleged subsequent agreement.

In their letter of April 4, 1874, after stating the return of the freight measurement received from California, the libellants say: "We would call your attention to the latter, (i. e., the freight measurement,) and think we ought to be paid on the difference as per charter-party, namely, 2,948 feet." In reply the defendants, on the eighteenth of April, wrote: "Your favor showing the amount of oak delivered at the Mare island navy is at hand. I have been from home, or it would have sooner had attention. I hope to receive an explanation soon showing the difference of measures, and as soon as we do, will call on you to adjust the account." Mr. Bigler has testified that, in using the words "will call on you to adjust the account," he referred only to the account of interest which, under the alleged subsequent agreement, was required to be made. It is impossible to believe that this is so. The perfectly obvious meaning of the letter is otherwise. That which the letter, to which this is a reply, alone asks to have adjusted, is a difference in the amount of freight.

The reply, without objecting to the justice of the demand, if the alleged fact on which it is based is true, asks time to ascertain if the fact of excess of actual cargo over bill of lading is correctly stated, and promises to call and adjust the account on ascertaining how the alleged fact is. There was no possible occasion for time to inquire as to the actual amount of the cargo, if all that the defendants intended to adjust was the interest under the agreement; and as matter of construction their letter must be held to be a written admission that the existing contract between the parties in respect to the amount of freight was the charter-party and that alone. The rule excluding parol evidence to vary a written agreement

does not preclude the parties to an agreement from varying or construing its terms by a subsequent writing. These letters constitute such a subsequent written admission as to the meaning of the contract. The testimony of the witness Bigler, in reference to this letter which he wrote himself, illustrates the untrustworthy character of his testimony as above referred to. In any view of the transaction the libellants are entitled to recover the balance of their freight according to the charter-party. The defendants are admitted to be entitled to the interest claimed, $461.42. Deducting this from $1,326.56, the balance of the freight, there remains due to libellants $865.14, with interest from April 4, 1874, $341,—in all, $1,206.14,—for which sum, with costs, the libellants are to have a decree.